

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00047-CV
_____


NATURAL GAS PIPELINE
COMPANY OF AMERICA, Appellant

V.

WILLIAM JUSTISS, ET AL., Appellees


On Appeal from the 62nd Judicial District Court
Lamar County, Texas
Trial Court No. 65759


Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

When Natural Gas Pipeline Company of America (NGPC) began to operate its natural gas compressor station in Lamar County in 1992, many of the property owners in the area did not consider it a desirable neighbor, complaining of the noise and odor the compressor station generated. Finally, in June 1998, the State cited NGPC for exceeding permitted emissions levels. About two months after the State issued that citation, the plaintiffs brought suit against NGPC, alleging that noise and odor emanating from its compressor station constituted a permanent nuisance.[1] Progress on the suit lagged for approximately ten years. After a trial on the merits, the jury concurred with some of the plaintiffs[2] and awarded those plaintiffs $1,242,500.00 in damages for the diminution in value of their properties. The trial court entered judgment on the verdict and awarded $645,229.00 in prejudgment interest.[3]

On appeal, NGPC argues that the trial court erred because: (1) the permanent nuisance claim was barred by the statute of limitations, (2) the facts supporting the jury's finding of a permanent nuisance are legally and factually insufficient, (3) the facts supporting the jury's damage awards are legally and factually insufficient, and (4) prejudgment interest was improperly awarded because the plaintiffs failed to segregate their past and future damages.

---

[1]Plaintiffs' First Amended Original Petition makes claims for nuisance, negligence, trespass, and personal injury; however, permanent nuisance was the only claim argued at trial.

[2]The jury found that the compressor station was not a permanent nuisance as to plaintiffs Robert Rast, as Executor of the Estate of Richard Rast, and Barry and Tina Cope, and, therefore, did not award them any damages.

[3]The judge also awarded the plaintiffs $991.00 in costs.

**Facts**

NGPC's compressor station #802 in Lamar County, Texas (the station), commenced operation in 1992. The station, located along a major natural gas pipeline, filters liquids from the natural gas flowing through the pipeline, compresses the gas to boost its pressure for further transmission, and then returns it to the pipeline for transmission elsewhere. Exhaust fumes from the station's operations are expelled into the air through stacks.

Soon after the station began operating, neighboring residents complained to NGPC and to State regulators. One of the plaintiffs, William "Bubba" Justiss (Bubba Justiss) made numerous telephone calls to NGPC complaining of the station's noise at least once per year from 1992 through 1996. Bubba Justiss also made telephone complaints about the station's noise and odor to the State regulators at the Texas Natural Resources Conservation Commission (now the Texas Commission on Environmental Quality, to which reference is made hereinafter both in its former and in its present incarnation as TCEQ) in 1994, 1995, and 1996. NGPC denied that the station caused any such problems, and NGPC's testing showed that the noise and fume levels were in compliance with government permits. Nevertheless, NGPC took measures to alleviate some of the noise by planting trees as sound breaks and installing "hospital quiet" covers for some of their machinery.

The plaintiffs and a mailman who had serviced the area for years testified that although the noise and odor had been an annoyance from the date the station began operations, in late 1997 and

3

1998, the noise and odor from the station appreciably increased to the point it became unbearable. On June 12, 1998, the TCEQ cited NGPC for a category 5 violation; under this classification, the TCEQ indicated that the odors from the station were overpowering, highly objectionable and (because such odors were capable of causing nausea and headache) a person encountering them would need to leave the area. A TCEQ category 5 violation is the most severe level and indicates an odor level offensive enough to prevent working or playing outside, would cause people to tend to remain inside, and even make it difficult to eat or sleep in the impacted area.

Two months after the June citation was issued, the twelve plaintiffs (William "Bubba" Justiss and Darlene Justiss, Joseph Justiss, Robert Rast, as Executor of the Estate of Richard Rast, Tommy Alspaugh and Judy Alspaugh, Barry Cope and Tina Cope, Joe Denton Mashburn and Christine Mashburn, and Joe Donald Mashburn and Judy Mashburn) brought suit against NGPC, alleging that the noise and odor from the station constituted a permanent nuisance. Over the next few months, attempting to address the State citation and the complaints, NGPC raised the height of some of its exhaust stacks by thirty feet and changed the brand of oil used in the compressor engines from natural to synthetic oil. NGPC argues that the TCEQ considers NGPC's actions to have adequately resolved the emissions violations, and all of the State's subsequent air testing have supported that conclusion. However, some of the plaintiffs testified that the odor has yet to improve and in some instances has actually gotten worse instead of better.

Almost ten years after suit was filed, the case proceeded to trial on the merits. Although some of the plaintiffs were awarded nothing by the jury, the others were awarded $1,242,500.00 in damages for the diminution in value of their property. The trial court entered judgment on the verdict and awarded $645,229.00 in prejudgment interest.

***There is sufficient evidence that the permanent nuisance claim accrued on June 12, 1998***

At trial NGPC argued alternatively. On the one hand, it maintained that there was no nuisance, but on the other hand that if the station's operation created a nuisance, the plaintiffs' cause of action was barred by the statute of limitations. However, the jury found that the noise and odor did create a permanent nuisance and that the claim for that nuisance arose on June 12, 1998, the date the TCEQ cited NGPC for violations. In its first point on appeal, NGPC argues that the two-year statute of limitations for permanent nuisance bars the plaintiffs' suit and that the evidence supporting the jury's finding is legally and factually insufficient.

Standard of Review

As a general rule, the party asserting the statute of limitations bears the burden of proving when the plaintiffs' causes of action accrued in order to demonstrate that statute of limitations was applicable as a bar to their claim. *Hoffman v. Wall*, 602 S.W.2d 324 (Tex. App.—Texarkana 1980, writ ref'd n.r.e.); *Naylor v. Gutteridge*, 430 S.W.2d 726 (Tex. Civ. App.—Austin 1968, writ ref'd n.r.e.).

5

When a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, the party must demonstrate on appeal that no evidence supports the finding and that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In evaluating the evidence's legal sufficiency, "we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (citing *Wilson*, 168 S.W.3d at 827); *Am. InterState Ins. Co. v. Hinson*, 172 S.W.3d 108, 114 (Tex. App.—Beaumont 2005, pet. denied). We sustain legal sufficiency challenges "when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla." *Suberu*, 216 S.W.3d at 793. "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Id*. (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

When a party attacks the factual sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Francis*, 46 S.W.3d at 242. In determining factual sufficiency, we must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding so against the great weight and preponderance of the evidence

6

that it is clearly wrong and unjust. *Id.*; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983).

Law and Facts

A plaintiff must bring a claim for permanent nuisance within two years of "when injury *first* occurs or is discovered." *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 270 (Tex. 2004); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (Vernon Supp. 2009). Accrual occurs upon notice of the injury or when the injury first occurs, even if the claimant does not yet know the full extent of the damages or the chances of avoiding them. *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79 (Tex. 2004).

NGPC relies on *Velsicol Chemical Corp. v. Winograd*, 956 S.W.2d 529 (Tex. 1997),[4] wherein Judwin, an apartment manager, sued for damages caused by chlordane (manufactured by Velsicol) sprayed by CMS (a pest exterminator) on apartment buildings' exteriors. In 1987, the Texas Department of Agriculture (TDA) investigated and determined that the chlordane on the outside of the apartments' walls had to be remediated and that chlordane had also penetrated to the individual apartments. However, because the chlordane levels discovered inside the apartments did not exceed environmental regulations, the TDA did not order the interiors remediated.[5] Four years later, new tests revealed that chlordane levels inside the apartments then exceeded

---

[4]NGPC also cites *Atlas Chemical Industries, Inc. v. Anderson*, 524 S.W.2d 681 (Tex. 1975), which we do not find applicable here.

[5]Chlordane "contamination" occurs when interior chlordane levels exceed 0.5 micrograms per cubic meter.

7

environmental regulations and required remediation. Judwin (who had been sued by tenants exposed to the chlordane) brought claims for property damage and injury to business. The Texas Supreme Court held that the statute of limitations barred Judwin's claims because her injuries, and, therefore, her cause of action, first arose when it was first learned by Judwin that chlordane residue was inside the apartments, not when it was discovered that the chlordane levels exceeded environmental regulations.

NGPC also cites to *City of Port Arthur v. Bowling*, 551 S.W.2d 155 (Tex. Civ. App.—Beaumont 1977, writ ref'd n.r.e.), where Bowling sued the city for property damage caused by emissions from the city's sanitation system. For years, Bowling had complained about the odor and emissions from the city's sanitation system. The jury found for Bowling, but also found that he first knew of the injury more than two years prior to filing suit, and, therefore, the court held his claims were barred by the statute of limitations.

The *Velsicol* case is distinguishable from the present case because here, the issue of when conditions arose to a nuisance level is in controversy because NGPC denied the existence of a nuisance at any time prior to 1998. Similarly, *City of Port Arthur* does not apply because in *City of Port Arthur* the jury determined that the injury first occurred more than two years prior to the filing of suit, whereas the jury in this case found the injury to have first attained a nuisance level within the limitations period.

8

In this case, there is ample evidence to support the jury's determination that the plaintiffs' cause of action accrued on June 12, 1998. NGPC's position was that its station operated at a normal capacity for much of 1992 through 1998 and that no nuisance existed at all from 1992 through 1997. The TCEQ citation informing NGPC that its emissions amounted to a "substantial interference" with neighboring property owners was dated June 12, 1998, the same date found by the jury to be the date upon which the cause of action accrued. Tommy Rutledge delivered the mail in the area of the station and the plaintiffs' properties for twenty-five years and he testified that the rotten egg-like odor from the station burns the nose and throat, that it was so bad that he tried to transfer to a different route, and that he began noticing the odors around 1998. Several of the plaintiffs, including Tommy Alspaugh, his wife, Judy, Joe Donald Mashburn, Christine Mashburn, Joseph Justiss, Bubba Justiss and his wife, Darlene, testified that the noise and odor from that station got much worse in 1997 and 1998, that at that point, it was so bad that "something had to be done," and that the conditions persisted and even worsened over the ten years between the date of filing the suit until trial.

It is the jury's province to resolve conflicts in the evidence. *Wilson*, 168 S.W.3d at 819–20. The jury remains the sole judge of witnesses' credibility and the weight to be given their testimony; it is free to accept or reject all or part of a witness's testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Therefore, it is the jury's province to decide when the conditions caused by the station arose to nuisance levels. Here, the jury was free to

accept NGPC's denials of any nuisance, accept the State's date of citation as the date of accrual, and consider the plaintiffs' pre–1997 claims and complaints about noise and odor as being complaints about bothersome issues not yet rising to the level of nuisance. We find there is legally and factually sufficient evidence to support the jury's finding that the cause of action first accrued in June of 1998 and overrule NGPC's first point of error.

***There is sufficient evidence that the station's operation amounted to a permanent nuisance***

In its second point of error, NGPC contends that the evidence supporting the jury's finding of a permanent nuisance is legally and factually insufficient.

<u>Law and Facts</u>

Question one of the jury charge instructed the jury that in order to find that a permanent nuisance existed as to any of the plaintiffs, the jury must first find that the operation of the compressor station created a condition that substantially interfered with the use and enjoyment of the land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities and that the conditions created by the station were sufficiently constant or regular that their future impact can be reasonably evaluated.[6] *Holubec*, 111 S.W.3d at 37; *Schneider Nat'l Carriers*, 147 S.W.3d at 283. Sufficiently extreme foul odors, dust, noise, and bright lights may constitute a

---

[6]Sufficiency of the evidence must be reviewed using the definitions and instructions contained in an unobjected-to jury charge. *Soto v. Seven Seventeen HBE Corp.*, 52 S.W.3d 201, 204 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citing *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex. 1985); *Allen v. Am. Nat'l Ins. Co.*, 380 S.W.2d 604, 609 (Tex. 1964)). Here, neither party objected to the instruction's definition, and the definition of permanent nuisance used in Question 1 matches the accepted caselaw definition as stated in *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003), and *Schneider Nat'l Carriers*, 147 S.W.3d at 283.

10

nuisance. *Holubec*, 111 S.W.3d at 37–38; *see also Bay Petroleum Corp. v. Crumpler*, 372 S.W.2d 318, 318–20 (Tex. 1963).

In weighing the evidence, it is the jury's duty to determine whether the frequency, duration, degree, and extent of the conditions at issue amount to the substantial interference required for a nuisance. *See Schneider Nat'l Carriers*, 147 S.W.3d at 281; *West v. Brenntag Sw., Inc.*, 168 S.W.3d 327, 336 (Tex. App.—Texarkana 2005, pet. denied). As a requisite to determine whether a nuisance is temporary or permanent, the jury also decides whether similar conditions are reasonably certain to continue in the future. *Schneider Nat'l Carriers*, 147 S.W.3d at 281; *Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430, 436 (Tex. App.—Fort Worth 1997, pet. denied) (affirming jury finding that injury to property was "ongoing and continuous").

In *Schneider National Carriers*, the Texas Supreme Court clarified the test for determining whether a nuisance is permanent or temporary, and the court conducted a comprehensive analysis of the distinctions between permanent and temporary nuisances. 147 S.W.3d 264. Whether a nuisance is permanent turns on expectations about its impact over a period of years. *Id.* at 276. A nuisance is permanent if it is "constant and continuous," if injury "constantly and regularly recurs," and if future harm can reasonably be predicted and evaluated. *Id.* at 272, 278 (quoting *Bayouth v. Loin Oil Co.*, 671 S.W.2d 867, 868 (Tex. 1984); *Rosenthal v. Taylor, B. & H. Ry. Co.*, 79 Tex. 325, 15 S.W. 268, 269 (1891)). A permanent nuisance may also be established by "showing that either the plaintiff's injuries or the defendant's operations are permanent." *Id.* at

11

283. Conversely, a nuisance is temporary "only if it is so irregular or intermittent over the period leading up to filing and trial that future injury cannot be estimated with reasonable certainty." *Id.* at 281. A nuisance is temporary if it is occasional, sporadic, intermittent, or of limited duration. *Bayouth*, 671 S.W.2d 868; *Rosenthal*, 15 S.W. at 269.

The issue here is whether there is legally and factually sufficient evidence that: (1) the odor and noise created by operation of the station caused a nuisance, (2) if a nuisance was created by the noise and odor, did the nuisance begin on the date found by the jury, and (3) if a nuisance was created, was it a permanent nuisance.

The testimony proffered by each of the plaintiffs regarding the character and degree of conditions, noise, and odor generated by the station is similar. Bubba Justiss, Joe Donald and Christine Mashburn, and Tommy Alspaugh testified that the smell burns the nose and smells like rotten eggs or car exhaust and is so bad that it makes it difficult or impossible to work or play outside, hang-dry their laundry, or keep their windows open for ventilation. They testified that the "regular" noise and vibration from the station sounds like a large diesel truck is running in the driveway and there are unpredictable times when the noise is much louder, occurring at all hours of the night and day. However, prior to the June 1998 citation, tests performed by NGPC and the TCEQ failed to reveal a nuisance, and NGPC took remedial measures (e.g., planting banks of trees and using new "hospital quiet" covers and insulators for some of their generators or engines) to dampen the sound emitted from the station.

12

The plaintiffs each testified that in the ten years since 1998, the odors have not improved, and some, including the Rutledges, Bubba Justiss, Joseph Justiss, Joe Denton Mashburn, Judy Mashburn, Joe Donald and Christine Mashburn, testified that the smell has, indeed, worsened in the intervening years. This worsening occurred even in spite of the ameliorative measures taken by NGPC of changing the type of oil and raising the height of the exhaust stacks at the station. NGPC attempted to rebut this contention by showing that the TCEQ tested the area in the fall of 1998 and throughout the next year and that those tests revealed the emission odors were within permitted levels and were no longer at a nuisance level.

It is the jury's province to resolve conflicts in the evidence. *Wilson*, 168 S.W.3d at 819–20. The jury remains the sole judge of witnesses' credibility and weight to be given their testimony, and is free to accept or reject all or part of a witness's testimony. *Jackson*, 116 S.W.3d at 761. From the testimony and evidence in this case a rational juror could have found a permanent nuisance. Such a finding is not against the great weight and preponderance of the evidence. Here, there is ample testimony and evidence to support the jury's finding of a nuisance and the ten years between the filing of suit and the time of trial provided the jury an ample time period from which it could determine that the conditions caused by the station are permanent. Therefore, we overrule NGPC's second point of error.

13

***The jury's damage awards are supported by legally and factually sufficient evidence***

After finding that NGPC's station created a permanent nuisance as to all the plaintiffs but the Estate of Richard Rast and Barry and Tina Cope, the jury awarded those plaintiffs about $1.2 million.[7] Separate damage awards were given for each plaintiff burdened by the nuisance. Rather than using an expert witness to testify to the diminution in value of their properties, the plaintiffs testified to their own respective property values. NGPC argues in its third point of error that the evidence is legally and factually insufficient to support the jury's damage awards.

Standard of Review

For this point of error, we apply the same standards of review for legal and factual sufficiency challenges that we applied to NGPC's second point of error.

Law

The attendant measure of damages for permanent nuisance is the difference, if any, in the property's market values immediately before and immediately after the nuisance occurred. *See Schneider Nat'l Carriers*, 147 S.W.3d at 276 (citing *Crumpler*, 372 S.W.2d at 320; *Lone Star Gas*

---

[7]The separate jury awards are as follows:

| | |
|---|---|
| William "Bubba" Justiss and Darlene Justiss | $540,000 |
| Joseph Justiss | $175,000 |
| Robert Rast, as Executor of the Estate of Richard Rast | $0 |
| Tommy Alspaugh and Judy Alspaugh | $270,000 |
| Barry Cope and Tina Cope | $0 |
| Joe Denton Mashburn and Christine Mashburn | $57,500 |
| Joe Donald Mashburn and Judy Mashburn | $200,000 |

14

*Co. v. Hutton*, 58 S.W.2d 19, 20 (Tex. Comm'n App. 1933, holding approved)); *see also Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984).

The proper way of proving diminution in property value is opinion testimony. *See State v. Carpenter*, 126 Tex. 604, 89 S.W.2d 194 (1936). Opinion testimony concerning this measure of damages is subject to the same requirements as any other opinion evidence with one exception: even lacking the qualifications of an expert, the owner of property can testify to its market value. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561 (Tex. 2002); *Porras*, 675 S.W.2d at 504. The expertise and qualifications of the witness are merely factors to be considered in weighing the testimony of an owner testifying about the value of his own property. *Dillon v. Troublefield*, 601 S.W.2d 141 (Tex. Civ. App.—Austin 1980, no writ); *Sw. Public Serv. Co. v. Vanderburg*, 581 S.W.2d 239 (Tex. Civ. App.—Amarillo 1979, writ ref'd n.r.e.). Where the property owner is the witness testifying to its value, "the rules pertaining to establishing the value of the property in question should be liberally construed." *First Nat'l Bank of McAllen v. Brown*, 644 S.W.2d 808 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.).

NGPC argues that: (1) the plaintiffs were unqualified to testify as to the value of their property; (2) their damage testimony was unsupported speculation; (3) some of their damage testimony is based upon intrinsic value, rather than market value; (4) even if the damage testimony had a basis, it was "conclusively" rebutted by NGPC's expert's valuation testimony; and (5) none of the plaintiffs testified to the correct measure of damages.

15

*Qualification*

In order for a property owner to qualify as a witness regarding the damages to his property, his testimony must show that it refers to the market value (as opposed to its intrinsic value or some other value measure). *Porras*, 675 S.W.2d at 504–05. This requirement is usually met if the owner demonstrates that he is familiar with its market value and his opinion is based on that market value. *Id.* at 505 (citing *Moody v. Castleberry*, 151 S.W.2d 960 (Tex. Civ. App.—Texarkana 1941, no writ)); *Khorshid, Inc. v. Christian*, 257 S.W.3d 748 (Tex. App.—Dallas 2008, no writ). In rendering an opinion concerning value, it is not necessary that the owner of the property use the words "market value" so long as his testimony reveals his familiarity with the market value of the property and his opinion was based on that market value. *Christian*, 257 S.W.3d at 760–61 (owner of cab had sold two cabs in past and testified to diminished value of damaged cab at issue); *see Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 669 (Tex. 1996).

The following is the summary of the evidence by the plaintiffs as to the value of their property:

- Tommy Alspaugh and his wife had lived in Howland, Texas (the community where the station and the affected lands are located), for almost fifty years. Tommy testified that their land is high quality property and well cared for. He testified,

16

and his wife, Judy, agreed, that their property had lost fifty percent of its value ($1,000.00 per acre loss in value) because of the conditions created by the station.

- Joe Donald Mashburn had lived in Howland his entire life, was a loan officer at a bank, and testified that he was familiar with the market value of real estate as a part of his employment. He testified that the value of his property had decreased by $400,000.00, an assessment in which his spouse, Judy Mashburn, concurred.

- Joe Denton Mashburn and his wife, Christine, testified that they were lifelong residents of the area near the pump station, owning a home on a three-acre tract and a separate nearby forty-acre tract. Christine testified that the home and three acres would be worth "maybe" $100,000.00 if it were not afflicted by the proximity of the pump station, but due to the negative influence of the pump station, she "[didn't] think it would be worth anything, but we might could get 10 or 20,000 for it." Although Joe Denton agreed with the $100,000.00 valuation of their home property absent the influence of the pump station, he believed that with the pump station, the value was about $25,000.00. Christine testified that their forty-acre tract would be worth $1,000.00 per acre without the station, but she "doubt[s] if we could get half that much now." Joe Denton disagreed with his wife, believing the forty-acre tract to be worth more than she did, testifying that it was worth $1,700.00

17

to $1,800.00 per acre without the station, but that the fair market value today, with the station was only about $500.00 or $600.00 per acre.

- Joseph Justiss grew up in Howland, built his home there, and worked cattle on his property. He had previously sold some of his real property and believed that his home had decreased in value between $75,000.00 and $85,000.00 and that the value of his second tract adjoining the State had decreased between $1,400.00 and $1,800.00 per acre due to the odor and vibration from the station.

- Bubba and Darlene Justiss had farmed their property near the station for decades. He testified that the odor and noise from the station had decreased the value of his property by about $1,250.00 per acre. Darlene agreed with her husband's valuation testimony.

Because an owner's testimony is an offer of the owner's best knowledge of the value of his property, it "constitutes sufficient evidence for the trier of fact to make a determination as to the value based on the witness's credibility." *Jones v. State*, 814 S.W.2d 801, 803 (Tex. App.—Houston [14th Dist.] 1991, no pet.) (citing *Sullivan v. State*, 701 S.W.2d 905, 908–09 (Tex. Crim. App. 1986)). There is ample evidence that the plaintiffs were familiar with their respective property and the surrounding area, and were, therefore, qualified to give their opinions regarding the diminution in value of their property.

*Unsupported speculation*

18

Where the property owner affirmatively demonstrates "that his opinion is cast in terms of approximation and estimate unsupported by any relevant facts leading to or supporting such approximation or estimate[,] the opinion testimony is too conjectural." *Stinson v. Cravens, Dargan & Co.*, 579 S.W.2d 298, 299 (Tex. Civ. App.—Dallas 1979, no writ); *see Ada Oil Co. v. Logan*, 447 S.W.2d 205 (Tex. Civ. App.—Houston [14th Dist.] 1969, no writ). For example, in *Royce Homes, L.P. v. Humphrey*, a property owner testified to the diminution in value of his home after a flood. 244 S.W.3d 570 (Tex. App.—Beaumont 2008, pet. denied). On cross-examination, the owner conceded that he calculated the post-flood value of his home by "pulling [it] out of the air[.]" *Id.* at 579. The court held his testimony to be speculation and, therefore, legally insufficient to support the damage award. *Id.* at 580. Similarly, in the case of *Coffee v. City of Alvin*, after testifying to the value of his land, the owner was cross-examined regarding whether or not he could substantiate or otherwise explain how he determined that value. 641 S.W.2d 597 (Tex. App.—Houston [14th Dist.] 1982), *writ ref'd n.r.e.*, 644 S.W.2d 709 (Tex. 1983). The owner characterized his dollar figures as "hypothetical" and "as a rule of thumb" which maybe he "pulled out of the air" and maybe "can't substantiate." *Id.* at 601. The court upheld the trial court's finding that the owner's property value testimony was of no probative value because it was cast in terms of approximation and estimate and unsupported by relevant facts. *Id.* at 602.

19

Unlike *Royce Homes* and *Coffee*, in this case, other than asking whether the properties had been independently appraised or offered for sale in the past, NGPC chose to forego cross-examination of the plaintiffs regarding the facts supporting their opinions, how they respectively determined their property values, or their knowledge of local real estate values. Rather, each of the plaintiffs, save for Bubba Justiss, directly and affirmatively testified to their opinion of the diminution in value of their property. When Bubba Justiss was asked about the diminution in value of his property due to the odor and noise from the station, he responded:

> A. I don't know. It's a hard thing for me to say because I never ever thought in my mind that it was worth *what the price of land is bringing now*. And the only thing that sold out that way lately are the sites –
>
> . . . .
>
> A I don't know. I don't know. I'm going to say probably across the whole acreage $1250.
>
> . . . .
>
> A. Decrease.

(Emphasis added.) The use by Bubba Justiss of the words "probably" and "I don't know" might, if taken out of the context of the person uttering them, be quite problematic. However, the jury could have easily taken into account that such qualifiers are common East Texas vernacular which are not necessarily intended to diminish the definiteness of the statement which follows; these words could have been discounted by the jury as nothing more than verbal pauses and manners of speech, much in the same vein as saying, "Let me see now." In contrast, Bubba Justiss's

20

testimony regarding "what the price of land is bringing now" indicates that he is familiar with the market value of real property in the area. We hold that no plaintiff affirmatively demonstrated that his valuation opinion was unsupported conjecture. Thus, the testimony could properly be given weight by the jury in reaching its decision.

### *Intrinsic value*

An owner's testimony regarding the value of his property must be based on market value, rather than intrinsic or some other value. *Porras*, 675 S.W.2d at 504–05. In *Porras*, a property owner testified to his property's value immediately before and immediately after an unauthorized bulldozing of a portion of his property. *Id.* at 505. He testified that it had diminished his property's value by $20,000.00. When asked to "tell the jury your reasons for the difference of twenty thousand dollars and how you arrived at it," Craig testified as follows:

> Well I bought this land to build a retirement home on and I am fifty-seven and my wife is fifty-six and she's not -- she's crippled so she wants to get out in the country, too. And we bought that for that reason and now we are afraid to build out there. And the reason we're afraid is because of the exotic animals that will be put next to us. Also they patrol the fence with guns. A sign on their fence they'll shoot if you go across that fence. And about a month ago there was a fire started on the grass on my property and burned in under my trees and if my wife had been there by herself she couldn't have got away.

*Id.* The court held that Craig's testimony was insufficient because it was "no evidence of market value" as the "owner's testimony affirmatively showed that he referred to personal rather than market value." *Id.*

21

In this case, NGPC argues that Joseph Justiss's valuation testimony is based on intrinsic value, rather than market value. When testifying to the market value of his property, Joseph testified that his property was worth more to him "than it would be worth to anybody." However, unlike the testimony in *Porras*, on re-direct Joseph clarified that his earlier valuation testimony were his opinions of the fair market value of his property.

*Expert's rebuttal*

In forming his opinion, NGPC's expert testified that he had investigated local land values, analyzed comparable sales prices in the area, and inspected the plaintiffs' properties. NGPC argues the valuation testimony of its well-qualified expert conclusively rebuts that of the plaintiffs. When a property owner testifies to the value of his property, his lack of expertise and qualifications are merely factors for the trier of fact to consider in weighing the owner's testimony. *Dillon*, 601 S.W.2d 141; *Vanderburg*, 581 S.W.2d 239. The conflicts between the plaintiffs' testimony and that of NGPC's expert presents a fact question for the jury regarding the value of the properties in question. It is the jury's province to resolve conflicts in the evidence. *Wilson*, 168 S.W.3d at 819–20. The jury is free to accept or reject all or part of a witness's testimony. *Jackson*, 116 S.W.3d at 761. Therefore, the jury was free to accept the plaintiffs' valuation testimony and reject that of the expert.

Incorrect measure of damages

NGPC also argues that the plaintiffs failed to testify to the correct measure of damages. The proper measure of damages for permanent nuisance is the difference, if any, in the property's market values immediately before and immediately after the nuisance occurred. *See Schneider Nat'l Carriers*, 147 S.W.3d at 276. Because the jury determined that June 12, 1998, was the date the plaintiffs' claims accrued, the correct measure of damages would be the difference in market value, if any, of each of the plaintiffs' properties immediately before and immediately after June 12, 1998. Strangely, there is no evidence in the record (presented by either the plaintiffs or by the defendant) of the plaintiffs' property values at this critical time. Rather, the plaintiffs testified to the 2008 value of their properties,[8] and NGPC argues that because of that, there is insufficient evidence to support the jury's damage awards.

Sufficiency of the evidence must be reviewed using the definitions and instructions contained in the unobjected-to jury charge, whether or not they accurately set out the controlling law. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000); *Soto*, 52 S.W.3d at 204 (citing *Larson*, 690 S.W.2d at 568; *Allen*, 380 S.W.2d at 609). In this case, the damage question submitted to the jury asked:

> What sum of money, if any, do you find from a preponderance of the evidence would fairly and reasonably compensate Plaintiffs for their damages, if any, which were proximately caused by the Defendant's interference?

---

[8]Some of the plaintiffs testified to their property's 2008 value with and without the presence of the pumping station itself, while others testified to their property's 2008 value with and without the conditions caused by the pumping station. In either case, none of the plaintiffs testified to the value of their property before and after June 1998.

The proffered jury instruction did not contain an accurate instruction as to the proper measure of damages. Although NGPC objected to the jury instruction on damages, it failed to include the correct measure of damages in its proffered damage instruction, as is required. Under the circumstances we have before us, we must determine whether there is legally and factually sufficient evidence of a "sum of money" that "would fairly and reasonably compensate Plaintiffs for their damages, if any, which were proximately caused by the Defendant's interference[.]" Here, as explained in the preceding sections, each plaintiff testified to their opinion of the diminution in value of their property and each plaintiff testified to the noise and odor conditions caused by the station. We conclude there is sufficient legal and factual evidence from which the jury could infer that the diminution values to which the plaintiffs testified were caused by the station's "interference." We overrule NGPC's third point of error.

### *Prejudgment interest may be awarded for permanent nuisance damages*

The judge awarded the plaintiffs $645,229.00 in prejudgment interest. In its fourth point of error, NGPC argues that an award of damages for a permanent injury includes future damages and that because the plaintiffs failed to segregate the future damages from those incurred in the past, the award of prejudgment interest must be vacated.

<u>Law and Facts</u>

A judgment in a property damage case earns prejudgment interest. TEX. FIN. CODE ANN. § 304.102 (Vernon 2006). However, prejudgment interest may not be assessed or recovered on

24

an award of future damages.  TEX. FIN. CODE ANN. § 304.1045 (Vernon 2006).  Prejudgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998) (quoting *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985)). Compensation other than for the lost use of money is a windfall, penalty, or fine, not "interest." *Battaglia v. Alexander*, 177 S.W.3d 893, 907 (Tex. 2005).

To recover prejudgment interest on an award of damages, the party seeking to obtain prejudgment interest must segregate past damages from any future damages.  *Cavnar*, 696 S.W.2d at 556, *abrogated in part on other grounds by Kenneco Energy, Inc.*, 962 S.W.2d 507; *Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214, 223 (Tex. App.—Amarillo 2003, no pet.).  Prejudgment interest is not recoverable on the elements of damages at issue when this burden is not met because it is fair to place the burden of submitting a segregating jury charge on the party benefitting from the charge.  *Cavnar*, 696 S.W.2d at 556; *KMG Kanal-Muller-Gruppe Deutschland GmbH & Co. KG v. Davis*, 175 S.W.3d 379, 396–97 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *Freeman*, 134 S.W.3d at 223.

The issue here is whether diminution in value, as damages for a permanent nuisance, include future damages for the purposes of prejudgment interest.  Damages for permanent nuisance include compensation for all losses, future as well as present.  *Crumpler*, 372 S.W.2d at

25

320; *Hutton*, 58 S.W.2d at 20; *City of Amarillo v. Ware*, 120 Tex. 456, 40 S.W.2d 57 (Tex. 1931). In support of its argument, NGPC cites to *Schneider National Carriers*, where it was stated that the lost market value awarded for a permanent nuisance "reflects all losses from the injury, including lost rents expected in the future." 147 S.W.3d at 276. The *Schneider National Carriers* court acknowledged that diminution in market value includes damages for the future because, as the court explained, estimates of market value, the relative measure of permanent nuisance damages, normally rest on expectations about future years. *Id.* at 277–79.

We believe NGPC's reliance upon *Schneider National Carriers* is misplaced. While the *Schneider National Carriers* court repeatedly refers to future damages when discussing permanent nuisance, it does so in the context of the trade-offs between temporary and permanent nuisances. 147 S.W.3d at 276–85. It would be impossible to sever future damages from present or past damages when calculating diminution in value because, as the *Schneider National Carriers* court explained, the market value of property is based upon the expectations of future years, and the only two numbers used to calculate diminution in value are a property's market values. Any time there is a permanent loss, there would be the concurrent loss of the future right of use; there is precious little value in the right of use during the duration of a lightning flash. Therefore, we do not believe that the *Schneider National Carriers* case holds that a permanent loss excludes the expectation of use past the instant of loss. Furthermore, the purpose of prejudgment interest is to deter undue delay, encourage settlement, and make up for the lost use of money during the

26

pendency of litigation. *Battaglia v. Alexander*, 177 S.W.3d 893, 907 (Tex. 2005). Should we determine that prejudgment interest may not be awarded on permanent nuisance damages as NGPC contends we should, it would directly conflict with the purpose of prejudgment interest and give parties a large incentive to delay the litigation of permanent nuisance cases. For the foregoing reasons, we overrule NGPC's fourth point of error.

We affirm the judgment.


                                        Bailey C. Moseley
                                        Justice

Date Submitted:     March 24, 2010
Date Decided:       April 30, 2010

27